UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| TONI PELOSI,<br><br>                          Plaintiff,<br><br>       - against -<br><br>QUEENS BALLPARK COMPANY, L.L.C. and<br>STERLING METS, L.P.,<br><br>                          Defendants. | COMPLAINT<br><br>PLAINTIFF DEMANDS A<br>TRIAL BY JURY |

Plaintiff Toni Pelosi ("Pelosi" or "Plaintiff"), by her attorneys, Vladeck, Raskin & Clark, P.C., complains of Defendants Queens Ballpark Company, L.L.C. ("QBC") and Sterling Mets, L.P. ("Sterling Mets") (collectively, the "Mets," "Team," or "Defendants") as follows:

NATURE OF CLAIMS

1.      Pelosi is a gay woman with multiple disabilities. Pelosi has long suffered from acute anxiety and Post-Traumatic Stress Disorder ("PTSD"). In June 2023, as a result of the unlawful conduct discussed below, Pelosi's doctors diagnosed her with Generalized Anxiety Disorder ("GAD") and depression.

2.      For approximately 20 years, Pelosi worked for the Mets.

3.      From 2004 to 2019, Pelosi worked for the Mets as a per diem Security Supervisor.

4.      In 2019, the Mets, based on Pelosi's many years of efficient and dedicated service to the organization, promoted Pelosi to a full-time position as Security Director. As Security Director, Pelosi led a team of over 250 staff members to provide comprehensive security services

1

to Shea Stadium and to Citi Field,[1] including by effectively enforcing the Mets' bubble protocols during the 2020 COVID season. In this role, Pelosi reported directly to John McKay ("McKay"), Vice President of Security, until he left the Team in November 2023.

5.    Despite Pelosi's strong performance in the role of Security Director, the Mets nonetheless treated her worse than her male and non-disabled colleagues. The Mets failed to promote Pelosi even though it commonly promoted men and non-disabled Security Directors after one year; paid Pelosi less than her male and non-disabled colleagues; and fostered a hostile work environment by failing to intervene in response to Pelosi's complaints about gender-based and disability-based discrimination.

6.    McKay, Pelosi's direct supervisor beginning in 2019, discriminated against Pelosi on the basis of her disability, gender, and sexual orientation. For example, McKay frequently made thinly veiled discriminatory comments toward Pelosi regarding her mental health and referenced stereotypes about women when discussing Pelosi's work performance.

7.    When Pelosi complained to multiple departments, including Human Resources and Legal, about, inter alia, McKay's discriminatory comments and the Mets' failure to promote her, the Team failed to address her complaints. Instead, McKay and the Mets retaliated against Pelosi by further demeaning he and treating her even worse. For example, McKay made thinly veiled threats regarding Pelosi's job security and excluded her from important communications.

8.    As a result, Pelosi's mental health conditions worsened, and she was forced to take medical leave beginning in June 2023. During Pelosi's medical leave, the Mets continued its discriminatory and retaliatory behavior, including harassing Pelosi by threatening to remove her

---

[1] From 1964 to 2009, Shea Stadium was the Mets' home stadium. Since 2009, Citi Field has been, and continues to be, the Mets' home stadium.

2

reasonable accommodation unless she gave the Team access to her medical records significantly beyond that which is required by law.

9. Pelosi returned to work for the Mets in her role as a Security Director in November 2023 after she learned that the Mets had fired McKay.[2] Upon Pelosi's return to work, the Mets continued to discriminate and retaliate against her by, inter alia, excluding her from important internal communications and meetings, refusing to promote her, failing to pay her equally to her male comparators, and, ultimately, firing her.

10. The reason the Mets gave for firing Pelosi is plainly pretext for unlawful discrimination and retaliation. The Mets claimed that it was firing Pelosi due to a restructuring of the Security department, but this explanation was not credible because, upon information and belief, Pelosi was the only employee affected within the Security Department by the purported layoffs. Furthermore, the Mets decided to retain men and non-disabled individuals in the Security Department who had not engaged in protected activity, and who were less effective and/or less experienced than Pelosi.

11. Pelosi brings this action to remedy Defendants' discriminatory and retaliatory conduct. Specifically, Plaintiff brings this action to remedy disability discrimination in violation of the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law § 290 et seq.; failure to accommodate in violation of the NYSHRL; disability discrimination in violation of the New York City Human Rights Law (the "NYCHRL"), Admin. Code of the City of New York § 8-107 et seq.; failure to accommodate in violation of the NYCHRL; failure to engage in cooperative dialogue in violation of the NYCHRL; retaliation in violation of the NYSHRL; retaliation in

---

[2] On information and belief, the Mets fired McKay because of incompetencies in his work product, not in response to Pelosi's many complaints about his discriminatory and retaliatory conduct.

violation of the NYCHRL; retaliation in violation of the Family Medical Leave Act (the "FMLA"), 29 U.S.C. § 2601 et seq.; gender discrimination in violation of the NYSHRL; gender-based harassment in violation of the NYSHRL; gender discrimination in violation of the NYCHRL; gender-based harassment in violation of the NYCHRL; violation of the Equal Pay Act (the "EPA"), 29 U.S.C. § 206(d); violation of New York's Achieve Pay Equity Act, N.Y. Lab. Law § 194 (the "APEA").

PARTIES

12.     Pelosi is a gay woman with multiple disabilities.

13.     On information and belief, Sterling Mets, L.P. d/b/a New York Mets, is a limited partnership formed under the laws of Delaware and headquartered in Flushing, New York. The Mets are Major League Baseball ("MLB") franchise based in Flushing, New York. The Mets employ more than 50 employees.

14.     QBC is a New York limited liability company with its principal place of business located in Flushing, New York.  QBC operates Citi Field, the home ballpark of the Mets. QBC employs more than 50 employees.

15.     QBC is a wholly owned subsidiary of the Sterling Mets. Management for both QBC and the Sterling Mets made decisions at issue in this matter, including decisions about compensating Plaintiff and firing her.

JURISDICTION & VENUE

16.     This Court has jurisdiction over Plaintiff's FMLA and EPA claims under 28 U.S.C. § 1331.

17.     Pursuant to 28 U.S.C. 1367, this Court also has supplemental jurisdiction over Plaintiff's NYSHRL, NYCHRL, and APEA claims because these claims closely relate to the

4

FMLA and EPA claims, having arisen from a common nucleus of operative facts such that all claims form part of the same case or controversy.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because Defendants regularly do business in Queens, New York and many of the acts of discrimination and retaliation occurred within the Eastern District of New York.

## PROCEDURE[3]

19.    Pursuant to Section 8-502(c) of the New York City Human Rights Law, Plaintiff will cause to be served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

## FACTUAL ALLEGATIONS

### Pelosi's Background

20.    Pelosi is a security professional with approximately 40 years of professional experience.

21.    Prior to working for the Mets, from 1984 to 2004, Pelosi worked as a Police Officer with the New York Police Department ("NYPD").

22.    In or around 1992, the NYPD rewarded Pelosi by assigning her to a prestigious position in recognition of her years of excellent performance. From 1992 until she joined the Mets in 2004, Pelosi worked in the NYPD's Patrol Borough Queens North Operations Unit. This role

_____

[3] Pelosi has filed a Charge with the United States Equal Employment Opportunity Commission (the "EEOC") alleging gender discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII") and disability discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (the "ADA"). When Pelosi receives her notice of right to sue from the EEOC, she will seek to amend the Complaint to add claims for gender discrimination under Title VII and disability discrimination under the ADA. The facts set forth herein support those claims as well, and therefore there will be no prejudice to Defendants by this procedure.

came with increased responsibilities. For example, Pelosi was frequently in charge of running the operations of eight precincts at the same time. Pelosi also led NYPD's security efforts for all large-scale events in Queens North, an area which encompassed Flushing, Queens, including the Mets' home stadium.

23.     Pelosi began working for the Mets in 2004 as a per diem Security Supervisor. In this role, Pelosi worked for the Mets during ticketed events hosted at Shea Stadium and later Citi Field, including baseball games, concerts, festivals, and conventions.

24.     In 2019, the Mets promoted Pelosi to be a full-time Security Director. As a Security Director, Pelosi led a team of over 250 staff members to provide comprehensive security services to Citi Field, including by effectively enforcing the Mets' bubble protocols during the 2020 COVID season. In this role, Pelosi reported directly to McKay.

25.     Throughout Pelosi's 20 years working for the Mets, she received praise for her efforts. Among other examples, the Mets consistently praised and positively rated her performance.

26.     The Mets provide employees with annual performance reviews. These reviews are conveyed to Mets employees orally by each employee's supervisor. Until December 2021, Pelosi had received only high praise during her performance reviews. As discussed below, only after Pelosi made protected complaints did McKay begin to criticize Pelosi's performance during her reviews.

27.     During Pelosi's tenure with the Mets, she frequently received praise from executives, colleagues, clients, and her supervisors, including McKay. For example, prior to Pelosi complaining about McKay's discriminatory conduct, McKay sent Pelosi multiple complimentary messages:

6

- On February 7, 2021, McKay sent Pelosi a text message in which he said that she was one of "the most valuable people" he had.

- On February 7, 2021, McKay sent Pelosi another text message in which he said, "You are my right hand[.]"

- On March 23, 2021, McKay sent Pelosi another text message in which he thanked Pelosi for her work and added, "[W]hat a great job you are doing steering this ship[.]"

- On March 30, 2021, McKay sent Pelosi another text message praising her leadership; he wrote, "I want to tell you one more time. How proud I am of you. Taking the reigns [sic] and doing this. Incredible[.]"

28.     Other Mets executives complimented Pelosi's job performance.

29.     For example, on June 17, 2021, Lorraine Hamilton ("Hamilton"), the Mets' Executive Director of Broadcasting and Events, sent an email to White and McKay with the subject line: "ABOVE AND BEYOND – TONI PELOSI." Hamilton's email praised Pelosi because she had picked up a terminally ill child in a golf cart and sped him through the stadium so that he could make it in time for his arranged meet and greet with Pete Alonso, a star player on the Mets. In Hamilton's email, she described how Pelosi's "quick thinking and willingness to help saved the day for this family and . . . made one young man's final wish come true."

30.     Hamilton again praised Pelosi's performance in writing. Pelosi had supervised and managed Security operations at one of Hamilton's events earlier that month. Following the event, on July 10, 2022, Hamilton sent Pelosi a text message thanking her for "everything" and stating, "You and your team have gone above [and] beyond and I am so grateful."

31.     In March 2022, the Mets featured Pelosi in one of its social media posts on X (formerly Twitter) during Women's History Month.[4] In the post, the Mets described Pelosi as

---

[4] See https://x.com/Mets/status/1509602560910442500?lang=en (last accessed Apr. 22, 2026).

someone who "leads a team of over 200 security personnel during ball games and concerts, controls ingress and ensures a safe family environment for all who visit [Citi Field]."

32.     Throughout Pelosi's employment, the Mets have recognized her successes and hard work by awarding her merit-based annual bonuses and pay raises.

<u>Pelosi's Disabilities</u>

33.     Pelosi's disabilities include acute anxiety and PTSD. Pelosi has had these disabilities for decades. Pelosi's disabilities substantially limit her major life activities.

34.     Pelosi's acute anxiety and PTSD have substantially limited her ability to, <u>inter alia</u>, perform manual tasks, eat, and breathe. Each of these activities becomes difficult, if not impossible, for Pelosi to do when her acute anxiety and/or PTSD are triggered. For example, when Pelosi is triggered, she trembles, which limits her ability to perform manual tasks; has no appetite, which undermines her ability to eat; and hyperventilates, which interferes with her ability to breathe. To help treat these conditions, Pelosi has been prescribed medication.

35.     As a result of the unlawful conduct described above and below, Pelosi's disabilities have worsened. In June 2023, Pelosi's doctors diagnosed her with GAD and depression. Pelosi's GAD and depression further substantially limit her major life activities.

36.     Pelosi's GAD and depression have further substantially limited her ability to, <u>inter alia</u>, perform manual tasks, eat, and breathe. Each of these activities becomes difficult, if not impossible, for Pelosi to do when her GAD and/or depression are triggered. To help treat these conditions, Pelosi has been prescribed medication.

37.     At all relevant times, Pelosi could perform the essential functions of her position with reasonable accommodations.

38.    The Mets, at all relevant times, was aware of Pelosi's disabilities. Pelosi had disclosed her disabilities to McKay in early 2019, around the time the Mets promoted Pelosi to Security Director. McKay used that information against Pelosi by making discriminatory and biased comments toward Pelosi as a means of antagonizing and humiliating her. As discussed below, Pelosi also disclosed her disabilities to Aubrey Wechsler ("Wechsler"), Human Resources; Katie Pothier ("Pothier"), the Mets' Co-General Counsel; and Jessica Villanella ("Villanella"), the Mets' Co-General Counsel.

<u>McKay's Biased Comments Toward Pelosi</u>

39.    Throughout the period Pelosi reported to McKay, he subjected her to discriminatory treatment in favor of male and non-disabled employees, including by making demeaning comments based on stereotypes about her gender and her disabilities.

40.    McKay was aware of Pelosi's mental health disabilities, specifically her acute anxiety and her PTSD, and used that information against her. He regularly triggered Pelosi's anxiety and PTSD symptoms by making comments that implicitly or explicitly referenced her disabilities.

41.    For example, McKay frequently told Pelosi that she had an "inferiority complex" and asked her what was "wrong" with her. McKay also complained to Pelosi, on multiple occasions, that Pelosi could not make it through an entire season without her health conditions becoming a "problem."

42.    McKay also demeaned Pelosi using gender-based stereotypes. For example, McKay told Pelosi on multiple occasions that she was "not a leader," even though she effectively led a team of over 250 Security Officers and had led multiple precincts during her time working

for the NYPD. Pelosi did not observe him make similar comments to similarly situated male employees who had less leadership experience than her.

43.    Other male employees followed McKay's lead. One male employee in particular had refused to comply with directives Pelosi had given him. That same employee followed instructions given to him by a male Security Director.

<u>The Mets Fail to Promote Pelosi</u>

44.    The Mets also discriminated against Pelosi based on her gender and her disability by failing to promote her.

45.    The Mets, on multiple occasions, promoted a male and/or non-disabled Security Director to Senior Security Director within one year of becoming a Security Director. This promotion comes with an automatic pay raise and prestige.

46.    For example, the Mets promoted Stephen Dillon ("Dillon"), a non-disabled man, from Security Director to Senior Security Director within one year of him joining the Mets. The Mets also promoted Conrade Murray ("Murray"), a non-disabled man, from Security Manager to Senior Security Manager within two years of him becoming a Security Manager.

47.    Despite Pelosi's strong performance for the Mets as Security Director, and before that as Security Supervisor, the Mets failed to promote her to Senior Security Director role. Pelosi held the position of Security Director for over four years.

48.    The Mets never formally raised with Pelosi any concerns regarding her performance as Security Director. To the contrary, Pelosi frequently received praise for her performance from her supervisors as well as Mets executives and clients.

49.    Indeed, during the Mets' 2020 season, McKay had explicitly told Pelosi that he was going to promote her. After that, he began including Pelosi in meetings with Mets executives.

When these executives questioned why McKay had included Pelosi in these meetings, McKay said, in sum and substance, that he wanted "to get her face out there" because it would help her get promoted. In other conversations with McKay, he compared Pelosi to other men whom he did promote, including Dillon.

50.     Also, during the COVID-plagued 2020 season, Pelosi performed many additional tasks beyond her typical job responsibilities, which ordinarily McKay had performed. Pelosi did so because McKay led her to believe that she would be promoted at the end of the season if, and only if, she had performed those tasks for him.

51.     Even though Pelosi had performed significant work beyond her normal duties and even though McKay had promised to promote her, McKay decided not to promote Pelosi after the Mets' 2020 season.

52.     McKay repeated this pattern in 2021. On February 7, 2021, McKay sent Pelosi a text message which stated, "Give me this season. I will get you promoted." McKay continued to assign Pelosi, and she continued to perform, many additional tasks based on his promise to promote her. Even though Pelosi successfully did her job, McKay never promoted her to Senior Security Director.

53.     On information and belief, the Mets' failure to promote Pelosi was based on her gender and because of her disability.

<u>The Mets Pay Pelosi Less Than Her Male and Non-Disabled Comparators</u>

54.     The Mets also discriminated against Pelosi based on her gender and her disabilities by paying her less than her male and non-disabled comparators.

55.     For example, after Dillon's hiring as Security Director, he and Pelosi held the same position with the Mets. Even though Pelosi had more relevant experience, had performed better

during her tenure with Mets, and had been more senior than him most of her tenure, the Mets paid him more than Pelosi. The Mets then promoted him to Senior Security Director, where he earned even more despite his lesser qualifications.

56.     Before joining the Mets, Pelosi had more experience than Dillon handling the duties required in the role of Security Director, including operating large-scale security operations. Pelosi worked in the NYPD's Patrol Borough Queens North Operations Unit for 12 years. In contrast, Dillon had no experience, or virtually no experience, leading surveillance or security efforts; he worked as a Detective before joining the Mets. McKay frequently boasted that he was the only reason Dillon had become a Detective with the NYPD. This was the same 'boys club' mentality that McKay brought to the Mets organization, which he used when denying Pelosi a promotion and otherwise treating her worse than her male counterparts.

57.     After joining the Mets, Pelosi was effective in her role and had more success than did Dillon as described below.

58.     Furthermore, Pelosi had a significantly longer tenure with the Mets than did Dillon. Pelosi began working for the Mets in 2004 and, in contrast, Dillon joined in or around 2018.

59.     On information and belief, the Mets paid Pelosi less than her male and non-disabled comparators, including Dillon, based on her gender and her disability.

<u>Pelosi's Protected Complaints to McKay</u>

60.     On multiple occasions, Pelosi attempted to address McKay's discriminatory behavior by speaking directly with him.

61.     For example, at the conclusion of the 2020 season, around September or October 2020, Pelosi asked McKay about the promotion which he had promised her. He did not respond to Pelosi's question. Through his actions, it became clear that McKay was not planning on promoting

Pelosi and, in fact, had never planned on promoting her. Rather, he had misled Pelosi by false promises.

62.    In December 2021, during Pelosi's annual performance review with McKay, Pelosi complained to him about his refusal to promote her to Senior Security Director. Pelosi also complained to McKay about how he does not treat her equally to other personnel in the Security Department, virtually all of whom were men at the time. McKay did not deny that he treated Pelosi worse than her male colleagues; instead, he asked, in sum and substance, "Why does it matter if you are not equal to Dillon?"

63.    During this December 2021 meeting, McKay made a biased comment. He said, in sum and substance, that he assumed that Pelosi was friends with Daphna Inbar ("Inbar") and Karen Sepp ("Sepp"), two other women who, at the time, worked for the Mets. Pelosi asked McKay why he had made such an assumption. Specifically, Pelosi asked McKay if he made that assumption because she is a woman or because she is gay. McKay responded by getting angry and dismissing Pelosi's question by saying that she was just using "buzzwords." He then left the room in a hurry and apparently angry without addressing Pelosi's concerns about his failure to promote, his unequal treatment of her compared to men, and his offensive gender-based assumptions.

64.    In early 2022, Pelosi tried once again to speak to McKay about his failure to promote her to Senior Security Director. To Pelosi's dismay, he became seemingly upset. He yelled at Pelosi, in sum and substance, "Is everything about money with you?!" He did not address Pelosi's concerns about his discriminatory treatment, including his unwillingness to promote her despite having promoted her less effective male counterparts in a shorter amount of time.

13

McKay Retaliates Against Pelosi

65.     After Pelosi complained to McKay about his discriminatory treatment, he began to engage in a pattern of retaliation against her.

66.     On or about June 12, 2021, during a meeting with McKay, he told Pelosi that she needed to change her attitude. Pelosi understood his comment to be both a thinly veiled reference to her recent complaint about his discriminatory behavior and a threat that he would fire her if she did not stop complaining. Pelosi did not observe or hear him direct men, including those who were assertive, to change their tone.

67.     McKay also began stripping away Pelosi's responsibilities. McKay took away one of Pelosi's most important direct reports. In 2021, Pelosi had selected Pete Tsoi ("Tsoi") to assist her by performing specific gameday responsibilities when the Mets played at home. McKay knew that Pelosi had considered Tsoi to be her "right-hand man." When Pelosi asked McKay for permission to bring Tsoi onto her team, he sent her a text message stating, "You don't need permission."

68.     After Pelosi began complaining to McKay about his discriminatory conduct, including his failure to promote her, however, McKay retaliated against her. McKay took Tsoi away from Pelosi's team. McKay unilaterally reassigned Tsoi to another role. McKay further retaliated against Pelosi by refusing to reassign anyone else to fill Tsoi's role. As a result, Pelosi not only lost a valued member of her team, but he also did not fill the position so Pelosi was left short-handed. Except for his handling of the situation with Tsoi, Pelosi is not aware of McKay ever reassigning personnel.

Pelosi's Protected Complaints to Others

69.     The Mets were aware of McKay's unlawful conduct. Throughout the time that McKay and Pelosi worked together for the Mets, in addition to her complaints directly to McKay, Pelosi made multiple complaints concerning unlawful discrimination and retaliation to the Mets' counsel, Human Resources, and other members of management.

70.     For example, in or around spring 2021, Pelosi complained to investigators from the law firm Wilmer Hale. At the time, Steve Cohen ("Cohen"), the Mets' Chief Executive Officer ("CEO") and majority shareholder, had retained the law firm to conduct a "work culture review" in response to numerous bias complaints.[5] Pelosi told Wilmer Hale attorneys about the gender-based and disability-based discrimination and retaliation that she was facing with the Mets.

71.     Starting in April 2022, Pelosi engaged in ongoing communications with Wechsler in Human Resources. Pelosi disclosed her disabilities to Wechsler and complained to Wechsler about McKay's discriminatory comments and abusive behavior toward Pelosi. In an April 2022 email, Wechsler lauded Pelosi's decision to step forward and complain. Wechsler wrote, "Thanks Toni, this is helpful. I really admire you taking that first step, it's not lost on me how difficult that is to do." Despite her platitudes, Wechsler failed to intervene to prevent McKay from engaging in further discriminatory and retaliatory behavior.

72.     In June 2022, Pelosi explained to Wechsler that certain other male employees had begun following McKay's lead. One male employee in particular had refused to comply with directives Pelosi had given him. That same employee followed instructions given to him by the male Security Director.

---

[5] See https://www.nytimes.com/athletic/2485087/2021/03/29/mets-law-firm-investigation-workplace-culture/.

73.    In summer 2022, Pelosi complained to Villanella, the Mets' Co-General Counsel. Pelosi disclosed her disabilities to Villanella, and Pelosi told her that McKay had been abusive, detailing his discriminatory and retaliatory comments toward Pelosi. Pelosi further explained that he had stripped her of work responsibilities. Villanella took no remedial action to address McKay's behavior.

74.    On or around March 21, 2023, Pelosi complained to Pothier, the Mets' Co-General Counsel. Pelosi disclosed her disabilities to Pothier and explained that she had been in regular communication with Human Resources about her bias complaints for over a year. Pelosi further explained that Human Resources had failed to intervene or otherwise prevent McKay from abusing her.

75.    On April 27, 2023, Pelosi complained to Brianna Spiegel (née Dammers) ("Spiegel"), Security Coordinator, via text message. McKay had recently blamed Pelosi for the apparent tension within the Security Department. Pelosi wrote to Spiegel that McKay had told her that, "[e]veryone walks on eggshells around me[.]" McKay's comment sent a clear message to Pelosi that she was an outcast because she had made complaints.

76.    On May 31, 2023, Pelosi complained to Chris Brown ("Brown"), the Mets' Vice President of Guest Experience, via text message. Pelosi wrote, "[McKay] did it to me again . . . [he] beats me down[.] Tells me I'm the one who can't get along with anyone[.] I give my [department] and this organization everything I've got . . . I cannot take this mental abuse he puts me through[.]" Brown responded, "Thank you for feeling you could share. I need to figure a way to share with Katie [Haas] [Executive Vice President of Ballpark Operations and Experience] without it affecting your relationship with [McKay][.]" Pelosi replied, "My relationship with [McKay] is non existent[.] I cannot continue like this[.]"

16

## McKay Further Retaliates

77.     After Pelosi engaged in protected activities by complaining to Weschler and Villanella, McKay further retaliated against Pelosi by again threatening to fire her.

78.     On or about May 5, 2022, during a meeting with McKay, he again told Pelosi that she was making everyone feel as though they were walking on eggshells. Pelosi understood McKay to be referencing her complaints about discriminatory behavior engaged in by him and other male colleagues.

79.     On or about May 17, 2022, McKay came to Pelosi after she had complained, in writing, about the lack of communication from him and his team. McKay angrily stated, "I see this is how you're gonna be now." On information and belief, McKay was attempting to discourage Pelosi from engaging in any further protected activity regarding the Mets' discriminatory and retaliatory conduct.

## Pelosi's Medical Leave

80.     Throughout 2022 and 2023, McKay and others continued to discriminate and retaliate against Pelosi by, inter alia, referring to her supposed "inferiority complex," excluding her from meetings and other important internal communications, and refusing to listen to her directives.

81.     As a result, Pelosi's mental health conditions worsened. In June 2023, Pelosi's doctors diagnosed her with GAD and depression. Due to Pelosi's work environment and its effect on her mental health conditions, her doctors recommended that she take a medical leave of absence from work.

17

82.     In June 2023, upon the advice of her doctors, Pelosi sought as an accommodation a medical leave of absence. The Mets originally granted Pelosi 30 days and then later granted her request to extend her leave of absence by another 30 days.

83.     However, when Pelosi requested another extension, the Mets initially refused to grant her request. Instead, the Mets claimed that Pelosi had requested an indefinite leave of absence and demanded medical information from her that was far in excess of the amount necessary to assess her request for unpaid leave as a reasonable accommodation for her disabilities.

84.     On September 15, 2023, Pelosi's counsel sent a letter to the Mets, explaining that she was in fact not requesting an indefinite leave of absence and objecting to the Mets' excessive and unnecessary request for her medical information. Only after Pelosi's counsel got involved did the Mets grant her request to extend her unpaid leave of absence.

85.     On information and belief, the Mets initially rejected Pelosi's request to extend her leave of absence because of her disability and because Pelosi had engaged in protected activities, including complaining about discrimination and seeking accommodations.

Pelosi's Return to Work

86.     On or about November 2, 2023, the Mets fired McKay.[6]

87.     After Pelosi learned that the Mets had fired McKay, Pelosi's doctors concluded that she could return to work. On November 21, 2023, Christina Stern ("Stern"), Pelosi's psychiatric nurse practitioner, wrote a letter stating that Pelosi could return to work on November 27, 2023.

88.     On November 27, 2023, Pelosi returned to work for the Mets as Security Director.

---

[6] On information and belief, the Mets fired McKay because of incompetencies in his work product, not in response to Pelosi's many complaints about his discriminatory and retaliatory conduct.

89.     Upon returning to work, many of Pelosi's colleagues excluded her from important internal meetings and communications. When Pelosi was included in meetings, her colleagues demeaned and threatened her. For example, on or about January 29, 2024, Dillon and others yelled at Pelosi during a meeting. Pelosi's colleagues knew that she had complained about McKay's unlawful conduct.

90.     Pelosi's then-supervisor, Keechant Sewell ("Sewell"), and Mets executives, including Susan Lucchi ("Lucchi"), knew that Pelosi's colleagues were retaliating against her because she complained to them about the retaliation and because they observed the retaliation themselves.

91.     For example, on January 29, 2024, Pelosi sent a text message to Lucchi, the Mets' Executive Vice President of Ballpark Operations, in which she stated, "It's everyone against me[.]" That same day, Pelosi sent another text message to Lucchi in which she said, "I feel like I'm being retaliated against[.]" Lucchi responded, "Totally get it."

92.     On or about January 29, 2024, Sewell, Senior Vice President of Security and Guest Experience, met with Pelosi individually. She was checking in on Pelosi because Dillon and others had yelled at Pelosi during a separate meeting earlier that day. When Sewell asked how Pelosi was doing, Pelosi immediately burst into tears. Pelosi explained to Sewell that her co-workers had excluded her since she had returned from her medical leave. Pelosi further told Sewell that she believed they were doing so because Pelosi had complained about discrimination and retaliation. Pelosi further explained that she did not feel that she could go to Human Resources for help because they had failed to intervene when she had previously complained to them.

93.     Despite being excluded from important internal meetings and communications, Pelosi contributed significantly after she returned from her medical leave. For example, Pelosi

helped prepare Citi Field for Opening Day in April 2024; interviewed and hired prospective Security Officers; conducted numerous orientations and trainings for new Security Officers; maintained the stadium's magnetometers[7]; performed countless walkthroughs[8]; ensured all MLB and Safety Act mandated supplies, including metal detector hand wands and proper signage at exits, were available and operational; and reorganized post assignments to ensure proper coverage during new construction inside the ballpark.

### Discriminatory and Retaliatory Firing

94.    On April 23, 2024, while Pelosi was working from home, Joseph Seminara ("Seminara"), Vice President of Strategic Security Operations, sent her a text message saying that Sewell wanted her to join a videoconference.

95.    When Pelosi joined the videoconference, she saw that Sewell; Katie Haas ("Haas"), Executive Vice President of Ballpark Operations and Experience; and Andrew Giuliani ("Giuliani"), Senior Director, Talent Acquisition, were already on the call. They told Pelosi that they were firing her, effective immediately. Pelosi asked them why they had decided to fire her. Haas said that the Mets were eliminating Pelosi's position. Pelosi then asked why the Mets were eliminating her position. Haas responded that Scott Havens ("Havens"), President of Business Operations, "wanted to bring the Security department in a different direction." This justification is pretext for discrimination and retaliation.

---

[7] Magnetometers are metal detectors, which enable Security Officers to non-invasively check an attendee's person for metal objects. All attendees must walk through a magnetometer, or otherwise be searched for metal objects, prior to entering Citi Field.

[8] A "walkthrough" refers to when a member of the Security team would accompany a client, such as potential advertising partners for the Mets, in a walk around the stadium and answer any questions they had about security and safety requirements.

96.     First, the Mets had undergone a restructuring as recently as a month before it fired Pelosi on April 23. On or about March 21, 2024, the Mets fired approximately 20 employees. If the Mets were truly discharging Pelosi as part of that restructuring, then it would have done so when it laid off 20 employees.

97.     Second, the Mets retained men and non-disabled individuals, including Dillon and Rob Stallone ("Stallone"), who were less experienced and/or less effective in their jobs than Pelosi as Security Director. Throughout Pelosi's tenure with the Mets, she received uniform praise, except for the discriminatory and retaliatory comments that McKay made. Even after Pelosi's dismissal, she received praise from current Mets employees. For example, on April 23, 2024, Brown sent Pelosi a text message in which he wrote, "I wish this didn't happen and feel you deserved better as you worked your ass off for this team and did anything that was asked of you. The Shea list[9] lost a great member but an even better person."

98.     In contrast to Pelosi, Dillon had well-known performance problems. He regularly did not know how to answer simple operational questions. He displayed other deficiencies, including:

- On or about December 13, 2023, he failed to assign a Security Officer to the employee entrance, which would have allowed anyone to enter the stadium unimpeded. This error was not fixed until Pelosi informed Sewell that Dillon had left that entrance unstaffed.

- On or about December 16, 2023, an intruder jumped a fence at the employee entrance and stole a golf cart from the Mets while Dillon was in charge.

- On or about December 18, 2023, another breach occurred while Dillon was in charge, including that three men climbed a fence. Dillon failed to detect the three men for three hours. During that time, the three men entered centerfield and even began climbing the Mets' new scoreboard.

---

[9] The "Shea list" was an informal nickname used by Mets employees to refer to individuals who had worked for the Mets before the team moved from Shea Stadium to Citi Field in 2009.

- On or about January 4, 2024, Pelosi had to cover for Dillon when Lucchi told Pelosi that Sewell was angry that no security personnel were assigned to work in the office that day. Pelosi agreed that it was important to have in-person coverage and promised to ensure that it did not happen again, even though it was Dillon's responsibility to assign security personnel.

99.    Stallone also had performance problems. For example:

- On or about January 18, 2024, Pelosi observed that Stallone had been submitting timesheets which did not accurately reflect the time that he had actually worked. Pelosi spoke with Lucchi about this issue who suggested that Pelosi track and check video cameras before taking further action. On or about March 3, 2024, Pelosi raised the same concerns with Seminara.

- On or about January 23, 2023, Pelosi observed Stallone sleeping at his desk. Michelle Cronk ("Cronk"), Director of Transportation and Medical Services, told Pelosi that she has witnessed Stallone asleep at his desk at least two other times.

100.    Third, the Mets immediately began seeking replacements to fill Pelosi's "eliminated" position. On April 24, 2024, one day after the Mets fired Pelosi, Dillon reached out to Karen Sepp ("Sepp"), former Gate Supervisor with the Mets, and asked if she was willing to return to her role "given Toni's [referring to me] position being eliminated[.]" Sepp responded, "I in good [conscience] can't return, Toni was a hard worker and a good boss. She didn't deserve her termination."

101.    Fourth, the Mets treated Pelosi worse than it did other individuals whom it had recently fired. For example, although the Mets informed Wechsler in or around June 2024 that it was firing her, the Mets allowed Wechsler to remain in her job until she found new employment. Upon information and belief, Wechsler does not have a disability and she did not engage in any protected activities.

102.    Further, the Mets fired Pelosi just two weeks ahead of her twentieth work anniversary with the organization. The Mets provided recognition, and often gifts, to individuals who reached work milestones, including anniversaries. The Mets did not similarly treat men, non-disabled individuals, or individuals who engaged in protected activities whom it fired.

22

## FIRST CAUSE OF ACTION
(Discrimination Based on Disability under the NYSHRL)

103.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 102 of this Complaint as if set forth herein.

104.    By the acts and practices described above, Defendants discriminated against Plaintiff by treating her differently in the terms and conditions of her employment based on her disabilities in violation of the NYSHRL.

105.    Defendants' conduct showed reckless disregard for Plaintiff's statutorily protected rights.

106.    As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer irreparable injury and other compensable damage unless and until this Court grants relief.

## SECOND CAUSE OF ACTION
(Failure to Accommodate under the NYSHRL)

107.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 106 of this Complaint as if set forth herein.

108.    By the acts and practices described above, Defendants discriminated against Plaintiff by failing to accommodate her disabilities in violation of the NYSHRL.

109.    Defendants' conduct showed reckless disregard for Plaintiff's statutorily protected rights.

110.    As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer irreparable injury and other compensable damage unless and until this Court grants relief.

## THIRD CAUSE OF ACTION
(Discrimination Based on Disability under the NYCHRL)

111.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 110 of this Complaint as if set forth herein.

23

112.   By the acts and practices described above, Defendants discriminated against Plaintiff by treating her differently in the terms and conditions of her employment based on her disabilities in violation of the NYCHRL.

113.   Defendants' conduct showed willful and/or wanton negligence, recklessness, and conscious disregard for Plaintiff's statutorily protected rights. Defendants' conduct was reckless to the degree it demonstrated conscious disregard for Plaintiff's statutorily protected rights.

114.   As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer irreparable injury and other compensable damage unless and until this Court grants relief.

### FOURTH CAUSE OF ACTION
(Failure to Accommodate under NYCHRL)

115.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 114 of this Complaint as if set forth herein.

116.   By the acts and practices described above, Defendants discriminated against Plaintiff by failing to accommodate her disabilities in violation of the NYCHRL.

117.   Defendants' conduct showed willful and/or wanton negligence, recklessness, and conscious disregard for Plaintiff's statutorily protected rights. Defendants' conduct was reckless to the degree it demonstrated conscious disregard for Plaintiff's statutorily protected rights.

118.   As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer irreparable injury and other compensable damage unless and until this Court grants relief.

### FIFTH CAUSE OF ACTION
(Failure to Engage in Constructive Dialogue under NYCHRL)

119.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 118 of this Complaint as if set forth herein.

120. By the acts and practices described above, Defendants discriminated against Plaintiff by failing to engage in constructive dialogue concerning accommodation of her disabilities in violation of the NYCHRL.

121. Defendants' conduct showed willful and/or wanton negligence, recklessness, and conscious disregard for Plaintiff's statutorily protected rights. Defendants' conduct was reckless to the degree it demonstrated conscious disregard for Plaintiff's statutorily protected rights.

122. As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer irreparable injury and other compensable damage unless and until this Court grants relief.

SIXTH CAUSE OF ACTION
(Retaliation under the NYSHRL)

123. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 122 of this Complaint as if set forth herein.

124. By the acts and practices described above, Defendants retaliated against Plaintiff for engaging in protected activity under the NYSHRL.

125. Defendants' conduct showed reckless disregard for Plaintiff's statutorily protected rights.

126. As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer irreparable injury and other compensable damage unless and until this Court grants relief.

SEVENTH CAUSE OF ACTION
(Retaliation under the NYCHRL)

127. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 126 of this Complaint as if set forth herein.

128. By the acts and practices described above, Defendants retaliated against Plaintiff for engaging in protected activity under the NYCHRL.

129.   Defendants' conduct showed willful and/or wanton negligence, recklessness, and conscious disregard for Plaintiff's statutorily protected rights. Defendants' conduct was reckless to the degree it demonstrated conscious disregard for Plaintiff's statutorily protected rights.

130.   As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer irreparable injury and other compensable damage unless and until this Court grants relief.

EIGHTH CAUSE OF ACTION<br>(Retaliation under the FMLA)

131.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 131 of this Complaint as if set forth herein.

132.   By the acts and practices described above, Defendants retaliated against Plaintiff for exercising protected rights under the FMLA.

133.   Defendants' conduct showed reckless disregard for Plaintiff's statutorily protected rights.

134.   As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer irreparable injury and other compensable damage unless and until this Court grants relief.

NINTH CAUSE OF ACTION<br>(Discrimination Based on Gender under the NYSHRL)

135.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 134 of this Complaint as if set forth herein.

136.   By the acts and practices described above, Defendants discriminated against Plaintiff by treating her differently in the terms and conditions of her employment based on her gender in violation of the NYSHRL.

137.   Defendants' conduct showed reckless disregard for Plaintiff's statutorily protected rights.

26

138.   As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer irreparable injury and other compensable damage unless and until this Court grants relief.

## TENTH CAUSE OF ACTION
### (Gender-Based Hostile Work Environment under the NYSHRL)

139.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 138 of this Complaint as if set forth herein.

140.   By the acts and practices described above, Defendants discriminated against Plaintiff by subjecting her to a hostile work environment based on her gender in violation of the NYSHRL.

141.   Defendants' conduct showed reckless disregard for Plaintiff's statutorily protected rights.

142.   As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer irreparable injury and other compensable damage unless and until this Court grants relief.

## ELEVENTH CAUSE OF ACTION
### (Discrimination Based on Gender under the NYCHRL)

143.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 142 of this Complaint as if set forth herein.

144.   By the acts and practices described above, Defendants discriminated against Plaintiff by treating her differently in the terms and conditions of her employment based on her gender in violation of the NYCHRL.

145.   Defendants' conduct showed willful and/or wanton negligence, recklessness, and conscious disregard for Plaintiff's statutorily protected rights. Defendants' conduct was reckless to the degree it demonstrated conscious disregard for Plaintiff's statutorily protected rights.

146.   As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer irreparable injury and other compensable damage unless and until this Court grants relief.

27

## TWELFTH CAUSE OF ACTION
### (Gender-Based Hostile Work Environment under the NYCHRL)

147.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 146 of this Complaint as if set forth herein.

148.    By the acts and practices described above, Defendants discriminated against Plaintiff by subjecting her to a hostile work environment based on her gender in violation of the NYCHRL.

149.    Defendants' conduct showed willful and/or wanton negligence, recklessness, and conscious disregard for Plaintiff's statutorily protected rights. Defendants' conduct was reckless to the degree it demonstrated conscious disregard for Plaintiff's statutorily protected rights.

150.    As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer irreparable injury and other compensable damage unless and until this Court grants relief.

## THIRTEENTH CAUSE OF ACTION
### (Pay Discrimination under the EPA)

151.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 150 of this Complaint as if set forth herein.

152.    By the acts and practices described above, Defendants, in violation of the EPA, have discriminated against Plaintiff by paying male employees higher wages than Plaintiff for substantially equal work in a job which required substantially equal skill, effort, and responsibility, and which was performed under substantially similar working conditions.

153.    Defendants' conduct was willful, and Defendants knew that their actions constituted unlawful violation of equal pay laws and/or showed reckless disregard for Plaintiff's statutorily protected rights.

154.    Plaintiff has suffered and will continue to suffer damages as a result of Defendants' willful and unlawful conduct.

<u>FOURTEENTH CAUSE OF ACTION</u>
(Pay Discrimination under the APEA)

155. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 154 of this Complaint as if set forth herein.

156. By the acts and practices described above, Defendants, in violation of the APEA, have discriminated against Plaintiff by paying male and non-disabled employees higher wages than Plaintiff for substantially equal work in a job which required substantially equal skill, effort, and responsibility, and which was performed under substantially similar working conditions.

157. Defendants' conduct was willful, and Defendants knew that their actions constituted unlawful violation of equal pay laws and/or showed reckless disregard for Plaintiff's statutorily protected rights.

158. Plaintiff has suffered and will continue to suffer damages as a result of Defendants' willful and unlawful conduct.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Court enter a Judgment:

(a) declaring the acts and practices complained of herein to in violation of the FMLA, the NYSHRL, the NYCHRL, the EPA, and the APEA;

(b) enjoining and permanently restraining these violations of the FMLA, the NYSHRL, the NYCHRL, the EPA, and the APEA.

(c) directing Defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect Plaintiff's employment opportunities;

(d) directing Defendants to place Plaintiff in the position she would have occupied but for Defendants' treatment of her, and making her whole for all earnings and other benefits she

29

would have received but for Defendants' treatment, including but not limited to wages, including back pay and front pay, bonuses, and other lost benefits;

(e)    directing Defendants to pay Plaintiff liquidated damages for its violations of the FMLA, EPA, and APEA;

(f)    directing Defendants to pay Plaintiff compensatory damages, including damages for emotional distress, humiliation, pain and suffering, and injury to professional standing and reputation;

(g)    directing Defendants to pay Plaintiff additional amounts as punitive damages;

(h)    awarding Plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

(i)    awarding Plaintiff the costs of this action, together with reasonable attorneys' fees; and

(j)    awarding such other and further relief as this Court deems necessary and proper.

<u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Federal Rule of Civil Procedure Rule 38(b), Plaintiff demands a trial by jury in this action.

Dated:  New York, New York
       April 23, 2026

VLADECK, RASKIN & CLARK, P.C.

By: _____*/s/ Jeremiah Iadevaia*_____
       Jeremiah Iadevaia
       Vladeck, Raskin & Clark P.C.
       *Attorneys for Plaintiff*
       111 Broadway, Suite 1505
       New York, New York 10006
       (212) 403-7300